1063 Wilson v. Career Education Corporation And Mr. Mikko? Thank you, Your Honor, and I'll try to make my presentation as compelling as I can for those that remain. May it please the Court. Move up, everyone. May it please the Court. My name is Doug Mikko, and I represent Riley Wilson in this appeal against his former employer, Career Education Corporation. As the Court's aware, this is the second time we're before the Court. In the prior appeal, a panel held that Mr. Wilson had sufficiently pled facts that showed that Career Education Corporation had, in fact, breached its duties of good faith and fair dealing. When it ended an incentive compensation plan earlier than required to do so by federal regulations, and after Mr. Wilson had actually completed his performance under that plan. We went back before the District Court, and we proved facts consistent with our allegations in the complaint. We proved that Career Education was actively promoting its incentive compensation plan up until the moment it cut that plan off, leading its admissions representatives, like Mr. Wilson, to reasonably believe that they would be paid for the work they had done. And we also deduced evidence that CEC, Career Education Corporation, cut off its incentive compensation plan early for its own benefit, not due to federal regulations. The District Court disregarded this evidence on summary judgment, and in so doing, made two critical errors. The first of those is this. The Court failed to simply recognize that Mr. Wilson reasonably expected to be paid for the work he had done. Under Illinois law, that itself makes out a claim for a breach of duty of good faith and fair dealing. Well, the remand instructions required proof of essentially but-for causation. The motive to achieve cost savings at your client's expense was the but-for reason for the decision to use an earlier date, as opposed to go all the way to the end of whatever time was allotted by the new regulatory regime. But-for causation is mentioned in the prior opinion. So is the fact 12 times in the opinion that a breach of duty of good faith and fair dealing can be made out where one party works contrary to the other party's reasonable expectations. And that comports with Illinois. But that's just a general statement of the law. The specific remand instructions were that there would be discovery, and then the case would proceed to summary judgment. And there must be evidence of this but-for connection between the money power grab motivation that's being alleged here and the decision to use the February date instead of the end of June. And Your Honor, the idea that what I just mentioned, the reasonable expectations inquiry, is just a general statement of Illinois law. I respectfully disagree with that. I think the Dian case relied upon by the district court. We're bound by what the prior panel said. Understood. Congratulations. It was quite a feat to get three different opinions in that case. I didn't want that to happen. And we're trying to thread the needle here. But as I read it, what you had to show is this idea of but-for causation. And we're not going to revisit that. We're not going to say that was an erroneous statement of Illinois law. Your burden wasn't that high. This is law of the case. We're here. Tell me what you got on that question. Absolutely. And let me go to that right this moment. On but-for causation, there's two real issues before that the district court committed error on. The first was really requiring sole causation instead of but-for causation. The difference is clear. It's been something provocative among the courts since probably the gross decision from the Supreme Court in 2009 announcing but-for causation for ADEA cases. The debate goes back a lot further than that. Okay. In the context, I guess I was thinking in the context of a plaintiff's item of employment work. It's a vexing concept. Right. It was made a little bit more clear recently in Justice Scalia's opinion in the Burrage case where he kind of identified how numerous things could be the but-for causation or but-for cause of an event without being the sole cause, and that's really what we have here. Let me talk about the evidence of but-for causation. Throughout our discovery, one thing became clear. Cost savings pervaded the decisional process. Yes, but forgive me for interrupting you. But if, as you have asserted, career education was faced with decreasing student admissions, decreasing revenues, increased cost, a deteriorating financial condition with each ensuing quarter of 2010, how could we hold that a decision to alter its employee compensation, you know, the structure of it, was not in good faith? I think that's, you know, for me, at any rate, it's sort of the bottom line that has to be answered. And let me try to answer that for you, Your Honor. The answer is that Career Education Corporation could change its compensation plan. It had that discretion under its own contract, but it had to do so consistent with the reasonable expectations of the other party. So where do we draw those expectations? In the prior court's opinion, we see that they're drawn from the course of dealings between the parties. The course of dealings, and we identified this in our brief, in discovery, the course of dealings of these parties show that up until the moment Career Education said we're no longer paying incentive compensation under this plan, it was promoting the plan to its employees as a compensation tool. That's important because, remember, there's a lag time between what Mr. Wilson would do under the plan and the money that he would get under the incentive compensation plan. So when he's busy in third quarter of 2010, working above his goals, starting more students, believing that down the road, as CEC says, it would take time, but it would pay off. CEC at that point was cultivating those expectations that if he did his work, he would get paid. Yes, but the contract, as I read it, reserved the right to terminate the plan, retain other bonuses at any time, and it would be, I mean, it seems to me that it would be objectively unreasonable for someone to believe that that kind of discretion could not be exercised, where a changing business climate worsens a financial condition of the company. I mean, a business that retains the right to alter salaries of a compensation structure can't, I just don't think it can be said to have acted in bad faith when it does so at a time of such financial, I don't know, downturn, financial troubles. And to one point that Your Honor made there, certainly a company can change compensation structures going forward. Career education certainly could have done so going forward, and in fact, that's all they had done throughout the entire term of the incentive compensation plan up until the time where it decided to cut off the plan in December and tell folks like Riley Wilson, you're not going to get paid for the work that you've done in July, August, and September. That's the third quarter. The second point, Your Honor, to the notion that CEC must have retained discretion to do what it did because that's what the contract says, that's actually not in comport with Illinois law. Illinois law is clear that when one party does retain full discretion under a contract, the good faith and fair dealing duties fill that gap to make sure that the party's reasonable expectations are met. The notion that Your Honor just articulated was actually the notion that Chief Judge Wood articulated in her dissenting opinion in the prior decision. The remaining, the majority of the panel found that unpersuasive and found that there was a duty of good faith and fair dealing. To the question of, you know, if we were in isolation, could CEC have done this? Perhaps. We didn't work in isolation. CEC didn't operate in isolation. As the prior opinion noted, the party's course of dealing is critical here. CEC's own evidence on this point shows that it was actively promoting the incentive compensation plan through the third quarter of 2010. I direct the court to a July 1st, 2010 email from Nicole Herzog. It's in the record at docket 90-17. In that document, Ms. Herzog, she's a Director of Compensation and Human Resources, indicates that she's sending to directors of admissions, Riley Wilson's boss, a PowerPoint presentation about the supplemental compensation plan. That plan that tells you, work hard now. It's going to take time, but this will add up for you. Work beyond your goals. This is July 1st of 2010. She says, specifically, she's sending the plan over now because she wants to, quote, make sure that advisors know enough about the program to be motivated by it. So Judge Rovner, when the question is, was it reasonable for Mr. Wilson to be motivated by the plan? The answer is, right in Ms. Herzog's statement, that was CEC's intention. Under the course of conduct of the parties, it was clear that that was the intention. Now, back to the question of cost and whether cost was a cause for CEC ending the plan early. CEC's own evidence on this point is that the biggest players in the decisional process, their chief financial officer testified it was about cost. The chief administrative officer and one of their most powerful business unit heads testified that the idea to move the plan and terminate the plan earlier than required by federal regulations was due to cost. Now, the district court weighed that evidence on summary judgment against the evidence of the CEO saying it was my decision finally and cost did not motivate me. That type of weighing of evidence, indirect versus direct evidence, is very close to the type of exercise this court just very recently criticized in the Ortiz versus Werner case, a Title VII case, that was about indirect and direct evidence on how courts really, on summary judgment, have no business weighing that evidence. The same is true here. Cost pervaded the process. You see that not only in the testimony of those three witnesses, but also Colin McLean, the human resources director, who said that cost probably influenced the decision to push the plan termination date back to February from July. Maureen Cahill testified consistently with that. Your Honor, as I see, I'm into my rebuttal time, and I'd like to stay at that. Thank you very much. All right. Is Alamuqa? Oh. Mr. Wow. Sorry. No, I imagine it's a beautiful name. Thank you. But it could also be a woman's name. That is correct. Yeah. May it please the Court. For the rest of you, his beautiful name is Sari, S-A-R-I. May it please the Court. My name is Sari Alamuddin. With me at the council table is my colleague, Mary D'Abricchio. Together we represent the FLE career education in this matter. As your Honors indicated, the key question on remand was whether Mr. Wilson could prove that a desire to save costs was the but-for reason for selecting the February 28, 2011 date for termination of the plan. We respectfully submit that Judge Brown correctly concluded that no reasonable jury could have concluded that that was the but-for reason for selecting the February 28 decision. You know, the argument seems to be that career education continued its active promotion of the plan to these admissions representatives, you know, continued assuring them that their efforts would be worth an eventual payoff in 2011. How long did career education make such statements? And is there evidence that those statements were made at a time when career education could not reasonably could not reasonably believe that the bonuses would be realized? I think it's important to look at this chronologically to see what was happening, Your Honor. So the proposed final regulations that would have proposed getting rid of incentive compensation came out in June 2010. Straight away, Gary McCullough, the CEO of the company, sent out a memo to all employees saying that these proposed regulations are there. We're posting the Department of Education's press release for you to read. And those regulations, if they go into effect, will go into effect on July 1, 2011. They were not final, however, until October 29, 2010. That's when CEC knew for sure that those regulations would go into effect, getting rid of the incentive compensation required and to do away with incentive compensation for their admissions reps. The email that my opponent is referring to is on July 1, 2010. We respectfully submit, the most it says, it says, in fact, the opposite. It says our message is around over-promoting the ARSC program has been tweaked given the proposed regulatory changes. In other words, we're changing the message to admissions reps given that these regulatory changes are out there. But again, we know, we don't know for certain that it's going away. We know it's going to be at least around for another six months. And so we want to make sure that admissions reps still know that that plan is around because the regs might not have been finalized. There might have been changes to the regs before they were finalized. A lot of things could have happened. CEC didn't know until October 29 that this incentive compensation plan was definitely going away. And it didn't know until December 3 when it would be going away. And it didn't even finalize the replacement plan until February of the following year. It was a total state of flux, lots of back and forth communications. And there's no evidence that CEC continued to, quote, over-promote the plan after October 29, 2010 when the regulations became final. So I hope that answers your question, Your Honor. We're still left with this disagreement among the executives of your client as to what should be done and the motivation for doing it. Why doesn't that create a jury question? For several reasons, Your Honor. First of all, I respectfully submit that the testimony has been overstated. The CFO did not testify that costs was a factor. That was a testimony of Maureen Cahill who believed that Mike Graham and who believed that George Graham were advocating to terminate the plan earlier. I'm sorry. Refresh my recollection. Who was Ms. Cahill? Ms. Cahill was the person in charge of compensation. She reported to Column. Thank you. But she also testified that Gary McCullough was the decision maker and that she didn't know what motivated Mr. Cullough and that ultimately we'd have to ask Mr. McCullough as to what his motivation was. And everybody agrees that Mr. McCullough was the ultimate decision maker. Colin McLean, who my opponent referenced, also said that, while I believe costs probably influenced the decision, I don't know what actually motivated Gary McCullough. You'd have to ask Mr. McCullough. Mr. McCullough testified unequivocally that costs had nothing to do with his decision. In fact, he made his decision for two reasons, one of which was he wanted to be very conservative with respect to regulatory compliance and he knew that even if you terminated the plan on a certain date, there'd be several weeks before payments would have to be continued and he didn't want to be the test case to go up against the line. If I can interrupt there. Sure. Was it clear in the regulations that no payments could be made after June 30th or just that no payments could be earned after June 30th? I think one of the problems was, Your Honor, was that there was precisely that which was there was a lot of uncertainty. We didn't know, the company didn't know what that meant. There certainly had been no guidance from the ED at that time and that was one of the reasons why Mr. McCullough wanted to be conservative with that date because he didn't want to be in a situation where some payments might have been made after that. Besides Mr. McCullough's testimony, is there any other testimony on the ambiguity? Yes, Your Honor. There is testimony from Maureen Cahill who testified that legislative adherence was a factor as well. Mr. McClain testified that legislative adherence was a factor as well and if you look at the contemporaneous documentation of the meetings of the task force that was looking at that decision, they talked about the need to be conservative, that need not to be the test case given what was going on. Thank you. The second reason that Mr. McCullough testified was the reason he selected February 28th was that he wanted to align the admissions rep's annual pay cycle and pay raises with the rest of the organization, which was on March 1st. This was going forward. Correct, exactly. And up until that point, admissions reps, some were on March 1, but others had their anniversary dates as their annual pay increases and now with the new regulations prohibiting two pay increases in a rolling 12-month period, he wanted to put everyone on March 1. That would have the added benefit of making sure that the admissions reps got the benefit of the supplemental plan as soon as possible on March 1. So that's my first answer to the question as to why there isn't an issue of fact, but there's a second point as well, which is the most anybody could infer was that cost was a consideration, but certainly not the but-for consideration. It could not have been the but-for consideration when from the outset documents and testimony show that CEC intended the replacement plan to be revenue neutral, and in fact CEC did not save any money. Why? When it came to the replacement plan. In fact, we spent slightly more than $1 million more than what we had been projected to spend in December had we extended the plan out to May 31. It was distributed differently so that there were winners and losers. Correct, but on a macroeconomic level, there were no savings, and in fact if we had intended to save costs, why would we have made the decision to reinvest 75% of the two-year average of the supplemental compensation plan into base salary, which everyone agrees was voluntary on our part. We did not have to do that. Why would we have added a 3% pay increase? Why would we have not terminated the plan even earlier, as Mr. Graeb was advocating for December 31, 2010? Well, you did it for morale of all your employees, you thought. There were competing interests, exactly, and I submit that it's not bad faith for an executive in a very uncertain environment where the for-profit education industry is under attack from Congress. There's hearings, there's mystery shopper programs, and he's trying to make the best decision he can. Here's what, did you think? Well, the equivalent of mystery shopper, I guess ABC News had like a mystery student come in and there was an expose on that, not for CEC but for one of its competitors. And by the way, its competitors were terminating their supplemental compensation plans even earlier than we did, some as far back as September 2010. So again, there is simply no evidence that there was an opportunistic grab. Have they all been sued too? I don't know if that's the case, Your Honor. I don't know. But there is no evidence of an opportunistic grab, much less that saving money was the but-for reason for selecting the February 28th date. Although I do want to also address my opponent's statement about Mr. Wilson's reasonable expectations. I submit, first of all, it's not Mr. Wilson's expectations that govern but the reasonable expectations of the parties, objective expectations, and that the focus, as Judge Hamilton said in his concurrence, needs to be on CEC's motivation, not Mr. Riley's expectations. But notwithstanding that, Mr. Riley could not have reasonably expected that when the plan ended, he would have been paid for students in the pipeline when the plan expressly provided otherwise. The plan specifically said that the bonuses are not earned unless the student completes the academic year or their academic program within the enrollment period that's specified. That's the dissent, basically, right? No, Your Honor. That is the breach of contract claim. We won on the breach of contract claim as to what the definition of earned was under the plan. So I'm simply saying that he couldn't have reasonably expected that he would be paid for that if the plan said otherwise. Right. As I understand the dissent, it's that the good faith principle and duty that's implicit in every contract can't possibly have been violated based on that contract language. But that position didn't carry the day. That's true, Your Honor. But I guess I'm saying something different, which is. . . Which is why the main focus here is on motivations and proof of but-for, that this was the but-for reason, the desire to keep the unearned bonuses for itself and stiff the associates. Which we respectfully submit we did not do. In fact, we went out of our way to make sure that it was revenue neutral across the board. In every presentation, that is the goal when we tally up the final numbers. And I want to make another point, which is that Maureen Cahill, who's Mr. Wilson's best witness, who testified that she believed that Mr. Grab influenced the decision and that cost was a factor, she was not around. She left on January 2011, and she testified that she did not even know if there were cost savings because obviously the details of the replacement plan had not yet been finalized as of the time she left. So, again, where is the evidence of but-for causation that a reasonable jury could find supports reversal of summary judgment in this case? And if the Court doesn't have any more questions, thank you for your time. Thank you. Okay, Mr. Nikos. Thank you, Your Honor. On the question of whether the admissions representatives had been alerted that there might be a change in the plan, Mr. Alamuddin mentioned this memorandum from Gary McCullough. It's in the record for your review, and we have cited it. It's a two-page document, single-spaced, ten-point font. At his deposition, I asked Mr. McCullough if he would read it for me. It took him almost five minutes to read it. There's one line in that document that even arguably references any change to the ARSC plan, the Admissions Representative Supplemental Compensation Plan. And when I asked Mr. McCullough if there was anything in that document that indicated they would stop paying in February, he agreed no. But there was nothing that said yes either? The course of dealings of the parties, as the Court has previously noted and the Illinois case has previously noted, the course of dealing of the parties is key, particularly when we're talking not just about historical course of dealings, but in this third quarter, the money that we're talking about, the student starts for the third quarter of 2010. Career Education Corporation is actively promoting. Now, my opponent noted that there's language that they weren't overpromoting. Well, they certainly weren't underpromoting. These PowerPoints that I noted in the record, they were pushed out to new employees. CEC is informing new employees in the third quarter of 2010 that this is the plan that's going to get them more money. And it might take time, but that extra effort is going to be worth it. The notion that CEC did not want to be the test case for noncompliance, really, that's just another way of saying that they acted in their own business interest, whether it's to align HR processes, to save money, to make sure that they're not under the microscope of the federal government. Those are all just different ways of working against the other parties' expectations. And as the court noted, it is really the reasonable expectations. Just because CEC believes that it could set off the plan at any time for any reason, this court's already held. That wouldn't be a reasonable interpretation of the plan. The last point I'll make is this. On the issue of cost savings, Mr. McCullough himself, not in testimony, but in an e-mail of December 23rd, three weeks after he let the admissions representative know that the plan was going to be cut off early, asked, is the go-forward plan set? Ms. Cahill responded that the idea to cut off the plan now and in February of 2011 had to be set, and they couldn't change course because the cost savings had already been accounted for. That leads to the reasonable inference that cost drove the termination of the plan. Is there other evidence? Certainly. It's up to a jury to weigh that evidence, not a court. So we'd ask this court to reverse summary judgment. Thank you. Thank you very much. Thanks to all parties. And the case will be taken under advisement. All right.